# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DWAYNE WILLIAM KIMAK, | ) |
| | ) No. 12 CV 7292 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration,[1] | ) |
| | ) May 2, 2014 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Dwayne Kimak suffers from what he describes as completely debilitating back pain stemming from the combined impact of a failed spinal surgery, degenerative disc disease, and a workplace injury. Kimak claims that in addition to—and in part, because of—his physical pain, he experiences serious depression and anxiety. Claiming that these conditions make it impossible for him to work, Kimak filed an application for disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423. After the Commissioner of the Social Security Administration denied his application, Kimak filed this suit seeking judicial review, *see* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Kimak's motion is granted and the Commissioner's is denied:

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

## Procedural History

Kimak applied for DIB and a period of disability on October 31, 2008, claiming a disability onset date of August 1, 2008. (Administrative Record ("A.R.") 27.) After his claims were denied initially and upon reconsideration, (id. at 88-91), Kimak sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 152-57). The ALJ held a hearing on June 15, 2011, at which both Kimak and a vocational expert testified. (Id. at 43-87.) On August 5, 2011, the ALJ issued a decision finding that Kimak is not disabled within the meaning of the Social Security Act and denied his claim for benefits. (Id. at 27-37.) When the Appeals Council denied Kimak's request for review, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). On September 12, 2012, Kimak filed the current suit seeking judicial review of the Commissioner's decision. (R. 1); *see* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. (R. 10); *see* 28 U.S.C. § 636(c).

## Facts

Kimak's claims have their foundation in what he describes as a failed spinal fusion surgery that he underwent in 1996, leaving him with a nonfunctioning titanium-based bone stimulator in his lumbar spine. For years following the surgery he was able to perform electronic circuitry and repair work, but he claims that in 2005 he injured his back while lifting something at work and has had significant back pain ever since. He attributes his ability to work for three years

2

after the injury to a sympathetic employer who allowed him to work reduced hours and take frequent breaks. That leniency persisted until August 1, 2008, when Kimak says his employer finally let him go because he was unable to perform the duties required of him. He has not worked since. At his hearing before the ALJ, Kimak presented both testimonial and documentary evidence in support of his DIB claim.

## A. Medical Evidence

On almost a monthly basis between November 2005 and June 2009, Kimak received treatment for his back pain from pain specialist Dr. Zaki Anwar. In November 2005 Dr. Anwar noted that Kimak's back pain—which he had previously controlled with opioid medication—had been exacerbated when he injured himself while lifting something at work. (A.R. 357-58.) Anwar physically examined Kimak, observing that he had a titanium-based bone stimulator in his lower left lumbar area. (Id. at 358.) He also noted that Kimak had significant tightness in his paraspinal muscles, significant reduction in his straight-leg raising test, difficulty walking and standing, and abnormal posture and balance. (Id.) Dr. Anwar recommended that Kimak receive an epidural steroid injection and increase his morphine dose, and instructed him to stay off work until he could get a CT scan. (Id.) A month later Kimak received the recommended epidural injection and reported a slight reduction in his pain. (Id. at 365.) Kimak told Dr. Anwar that he would like to go back to work with some restrictions, and Dr. Anwar endorsed that approach and instructed him to continue taking morphine. (Id. at 353-55.)

Dr. Anwar's treatment notes reflect that between January 2006 and June 2007, Kimak struggled to find significant relief from his back pain. (See, e.g., 341-52, 409-14.) Dr. Anwar diagnosed him as having "significant" lumbar post-laminectomy syndrome, lumbar strain, failed back surgery syndrome, and lumbar radiculitis. (Id. at 333, 336, 345-48.) In his physical examination notes Dr. Anwar reported tightness in Kimak's paraspinal muscles and tenderness in his psoas muscles. (Id. at 348.) He observed Kimak walking with an antalgic gate and having postural issues. (Id. at 410.) Dr. Anwar also observed that Kimak experienced "significant spasms" which were "getting worse with time." (Id. at 339.)

Dr. Anwar's notes from this period reflect that Kimak experienced some temporary relief with epidural injections, but his low-back pain would always return. Dr. Anwar observed that Kimak's scar tissue was making it difficult to infiltrate medication into the epidural space. (Id. at 348.) He noted that additional surgery was not an option for Kimak because there was a risk that it would debilitate him more. (Id. at 346.) Accordingly, he turned to a treatment called "caudal adhesiolysis under fluoroscopy." (Id. at 345.) The record reflects that Kimak experienced some improvement with that treatment, but again the relief was temporary, lasting no more than three weeks. (Id. at 409-10.) Dr. Anwar also treated Kimak throughout this period with pain medications including OxyContin and morphine sulfates. (R. 330, 332, 336.) But having explored these treatment avenues, in the spring of 2007 Dr. Anwar observed that Kimak had achieved "pretty

much maximum medical improvement" and would need continuous treatment with pain management and caudal adhesiolysis from time to time. (Id. at 410.)

Dr. Anwar's treatment notes from this period are also replete with observations of how Kimak's on-going pain impacted his mental state. In May 2006 Dr. Anwar noted that Kimak was having significant difficulty dealing with his pain and that he was experiencing severe depression and/or anxiety. (Id. at 345.) He described Kimak as "unable to function and focus," as being "mentally tired," and as needing psychiatric care. (Id. at 343.) He wrote that Kimak was seriously depressed and unable to sleep. (Id. at 341.) There is corroborating record evidence of his depression in the form of the treatment notes from Dr. Bodipotti, a psychiatrist who saw Kimak from 1997-2009. (Id. at 684-95.) Although her handwritten notes are so difficult to read that they are of limited utility here, they show that Kimak saw her periodically to deal with his depression and anxiety. (Id.)

Beginning in late August 2007 and lasting through April 2008, Dr. Anwar's notes reflect what might be characterized as more positive results from Kimak's pain treatment. In August 2007 Dr. Anwar switched him to duragesic patches, which managed Kimak's pain "fairly successfully." (Id. at 405.) During that period Dr. Anwar noted that Kimak reported "less intense low back pain." (Id. at 398-406.) Dr. Anwar also noted that Kimak was experiencing less breakthrough pain (sudden, temporary flares of severe pain) and was responding well to the duragesic patches. (Id.) At the same time, Dr. Anwar noted that Kimak still needed to change his duragesic patch every 48 hours and that there was a need to wean him off of

Vicodin and morphine. (Id. at 398.) He also characterized Kimak as having a "restrictive work capacity," noting that he could only work for three to four hours a day. (Id. at 399-401.)

Beginning in May 2008 Kimak once again began describing his pain to Dr. Anwar as being "intense." (Id. at 397.) He had recently gained weight and had been diagnosed with diabetes. (Id. at 394.) In the summer of 2008 Dr. Anwar became concerned when Kimak presented with a distended abdomen, discolored eyes, and increased pain. (Id. at 392.) By September 2008 he noted that Kimak was "not responding very well" to changes in his opioid medications and was getting less relief from the duragesic patches. (Id. at 390.) He completed a work status report for Kimak in December 2008 in which he opined that Kimak was permanently unable to return to work. (Id. at 367.) But by the spring of 2009, Dr. Anwar again noted that Kimak's back pain was less intense and that he was responding well to changes in his medications. (Id. at 439, 441.) In the last of his treatment notes available in the record, Dr. Anwar suggested a return to lumbar caudal epidural steroid injections, characterized Kimak as a good candidate for morphine sulfate and for restarting duragesic patches, and noted that he had improved as much as medically possible. (Id. at 439-40.)

There is a gap in the treatment record from June 2009 until January 2011, when a new pain specialist, Dr. Cheema, submitted a letter on Kimak's behalf recommending that he be found eligible for disability benefits. (Id. at 680.) According to Kimak, he began seeing Dr. Cheema on a monthly basis in September

2010. (Id. at 297.) Dr. Cheema diagnosed Kimak as having debilitating back pain with grade four anterolisthesis of L5 on S1. (Id. at 680.) He predicted that Kimak's condition will only deteriorate, causing worsening pain and decreased mobility. (Id.) He opined that Kimak would never be able to return to meaningful employment and wrote that he requires "very strong narcotic pain medications" just to get through the day. (Id.)

The Commissioner asked a number of consulting doctors to weigh in on the extent of Kimak's impairments and their impact on his ability to function in the workplace. In March 2009 clinical psychologist Dr. Erwin Baukus spent one hour examining Kimak. (Id. at 456-60.) He wrote that Kimak walked with a cane and reported chronic severe back pain. (Id.) Kimak also reported depressive symptoms like loss of interest in activities, decreased energy, and trouble sleeping, concentrating, and thinking. (Id. at 457.) He also had persistent anxiety and recurrent severe panic attacks. (Id. at 458.) Dr. Baukus diagnosed him as having chronic pain disorder with psychological factors. (Id. at 460.) The next day Kimak was evaluated by internist Dr. Dinesh Jain, who wrote that Kimak was not in any acute distress and displayed normal grip strength and fine manipulation, and had a normal range of motion in his lower extremity joints and cervical spine. (Id. at 465-67.) But he also observed that Kimak's range of motion in his lumbosacral spine was decreased to 40-50 degrees in flexion, and he had positive straight-leg raises. (Id. at 467.) Kimak had "severe difficulty" getting on and off the table because of his

pain, and displayed moderate difficulty with tandem walking, walking on his toes and heels, and squatting. (Id.)

That same month two consulting doctors submitted residual functional capacity ("RFC") assessments describing Kimak's limitations based on their review of his medical file. Dr. Richard Bilinsky opined that Kimak can sit for six hours and stand and/or walk for at least two hours in an eight-hour day and that he had no manipulative limitations. (Id. at 469-71.) He wrote in the narrative portion of his report: "Credibility issue on many levels especially concerning physical and mental limitations cause of pain." (Id. at 473.) Carl Hermsmeyer, Ph.D., submitted a psychiatric RFC report opining that Kimak has moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. (Id. at 486.) Expanding on that opinion Dr. Hermsmeyer checked boxes saying that Kimak is moderately limited in his ability to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, and to maintain regular attendance and punctuality. (Id. at 490.) Dr. Hermsmeyer further explained that Kimak "retains the mental capacity to perform simple one and two-step tasks at a consistent pace." (Id. at 492.) On March 30, 2009, a case worker reviewed the RFC reports and wrote that Kimak maintains the ability to engage in sedentary occupations. (Id. at 216.)

There are a number of additional opinions about the limiting effects of Kimak's impairments that were submitted to the Social Security Administration between July and December 2009. In July 2009 Dr. Anwar submitted a letter

noting that he had been treating Kimak for four and a half years and that Kimak suffers from intractable pain. (Id. at 452.) Dr. Anwar described Kimak as "extremely limited" and opined that he is unable to bend, reach, use his hands, or lift more than 10 pounds. (Id.) He further opined that Kimak can sit for only 30 to 45 minutes and stand for only 30 minutes at a time. (Id.) He said that the side effects of Kimak's medications reduce his cognitive ability and exacerbate his fatigue, and that he is likely to grow increasingly impaired. (Id.) He further noted that Kimak's fatigue, pain, and depression impair his concentration, drastically reduce his speed and accuracy at tasks, and make him unable to motivate and persevere. (Id.)

In August 2009 two case workers opined based on Dr. Bilinsky's RFC assessment that Kimak is capable of performing unskilled sedentary work. (Id. at 281, 667.) One of those reviewers, Francis Vincent, opined that Dr. Anwar's opinion should not get controlling weight because his own notes show that Kimak improved with medication and because Kimak walked with a normal gait at his consulting examination. (Id. at 667.) Four months later, in December 2009, Dr. Anwar submitted another letter reiterating that Kimak's pain is "intractable," that pain medication has not ended his pain, and that he has to lie down and rest throughout the day. (Id. at 669.) He described what he believed to be Kimak's limitations in lifting, bending, reaching, using his hands, sitting, and standing, and reiterated his opinion that Kimak is permanently disabled. (Id.)

**B.	Kimak's Hearing Testimony**

During his hearing before the ALJ, Kimak testified that he stopped working in 2008 when his employer let him go because he was no longer able to perform his duties as an electronic technician.  (A.R. 48-49.)  Kimak said that prior to 2008 his employer had tried to accommodate him by letting him work only three to four hours a day and by allowing him to lie down in his car every hour for fifteen minutes.  (Id. at 52, 58.)  He said that the pain in his back had gotten so bad that he had difficulty doing "pretty much everything" his job required.  (Id. at 48.)  He was often late to work because he had difficulty getting up in the morning, and once he got in he was only able to work in 30-minute spurts before he had to change positions.  (Id.)  Kimak testified that his employer fired him because he had not been able to increase his hours or get his repairs done quickly enough.  (Id. at 52.)

When asked to describe his pain, Kimak testified that it feels like his spine is constantly "in a vice" and it is hard for him to get any relief.  (Id. at 49.)  He rated his pain at the time of the hearing as an eight out of ten, which he characterized as being his average.  (Id. at 63.)  The pain is particularly acute in the morning when he wakes up until his pain medication kicks in 45 minutes later, at which time he finally stands up and tries to loosen up.  (Id. at 49, 67.)  He has to lie down after showering to relieve his pain.  (Id. at 49-50.)  Kimak said that sometimes he experiences severe stabs of pain that make his whole body jerk.  (Id. at 68.)  The pain wakes him up throughout the night.  (Id. at 50.)  He can walk far enough to check the mail but after doing so the pain is worse.  (Id. at 52.)

Kimak also described what he characterized as his depressive symptoms and anxiety. (Id. at 63.) He said that he experienced depression after his divorce and after his 1996 back surgery, but that his depression has been more severe since he reinjured his back in 2005. (Id.) He experiences anxiety in crowds and traffic, which is one reason why he no longer drives. (Id. at 69-70.) He also experienced anxiety when his boss criticized him for being unable to get his work done. (Id. at 69.)

In describing his daily activities, Kimak testified that he lives in the basement of his parents' house and no longer has a driver's license. (Id. at 53.) His parents drive him to doctors' appointments. (Id. at 57.) His friends rarely visit and he seldom goes anywhere for more than an hour because of his pain. (Id. at 54-55.) He rarely uses a computer because he has trouble sitting for more than 15 minutes. (Id.) On a good day, the farthest he might walk is through the grocery store where he uses a shopping cart instead of a cane to help him balance and to relieve some of the pain. (Id. at 61.) After a trip to the store he would need to lie down for at least an hour. (Id. at 62.) The only chore he described performing is folding towels. (Id. at 64.) Kimak said that he has difficulty remaining focused because of his pain, and that since 2005 he has not been able to watch an entire movie. (Id. at 65.) He spends much of the latter part of the day lying down in an armchair. (Id. at 66.)

## C. The Vocational Expert's Testimony

Vocational Expert ("VE") Randall Harding testified at the hearing regarding the kinds of work a person with certain hypothetical limitations would be able to

perform. When asked if a person with an RFC for light work who is limited to only occasionally climbing ramps and stairs, balancing, stooping, and kneeling, with the need to avoid concentrated exposure to hazards and the ability to "perform simple, repetitive and routine work tasks" would be able to perform any work, Harding testified that such an individual could work as a parking garage cashier, housekeeper, or mail clerk. (A.R. 77-78.) When the ALJ asked whether a person with the same limitations except limited to sedentary work could perform any jobs, Harding testified that he could work in clerical addressing, optical assembly, and circuit board assembly. (Id. at 78-79.) Adding a restriction that the person needed a cane to ambulate eliminated only the housekeeping job. (Id. at 79-80.) Harding noted that a person likely to be off-task for 25 percent of the workday because of pain and concentration issues would not be able to sustain employment. (Id. at 82.)

## D. The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Kimak is not disabled under sections 216(i) and 223(d) of the Social Security Act. (A.R. 36.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work. *Id.* § 404.1520(f),(g).

Here, at the first two steps of the framework the ALJ found that Kimak has not engaged in substantial gainful activity since August 1, 2008, and that he has severe impairments in the form of degenerative disc disease, "status post 1996 spine surgery," and depression. (Id. at 29.) At step three the ALJ determined that none of Kimak's impairments are conclusively disabling, because they neither meet nor medically equal a listing. (Id. at 30.) The ALJ specifically ruled out listing 1.04 for disorders of the spine and listing 12.04 for affective disorders. (Id.) In evaluating the severity of Kimak's mental impairments, the ALJ concluded that he has mild restrictions in activities of daily living based on his reports that he is able to perform his own personal care, use public transportation, and prepare meals. (Id.) She also noted that her finding is consistent with Dr. Hermsmeyer's mental RFC. (Id.) Although Dr. Hermsmeyer and Russell Taylor, Ph.D., rated Kimak as having moderate difficulties in social functioning, the ALJ concluded that his restrictions in this area are only mild "based upon the overall record and the claimant's hearing testimony." (Id. at 30-31.) The ALJ concluded that Kimak has moderate difficulties

in concentration, persistence, or pace based on the difficulties he exhibited with immediate memory in his consulting examination. (Id. at 31.)

Proceeding to the next step, the ALJ determined that Kimak retains the RFC to perform light work with the following limitations: occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; occasionally balance and stoop but never kneel, crouch, or crawl; avoid concentrated exposure to hazards; and limited to work that involves only simple, routine, and repetitive tasks. (Id. at 31-32.) In explaining her analysis, the ALJ reasoned that she found Kimak's allegations regarding his level of pain to be less than credible based on what she perceived as a lack of support in the objective record, a 15-month gap in which he did not see his pain specialist, and evidence that his pain had decreased in 2008. (Id. at 32-33.) She gave "little or no weight" to Dr. Anwar's opinions, minimal weight to Dr. Cheema's opinion, and significant weight to the opinions of the state consulting physicians. (Id. at 34.) Based on this RFC, the ALJ concluded that Kimak is unable to perform any of his past work, but at step five, she determined that Kimak could perform several jobs that exist in significant numbers in the national economy, including parking garage cashier, housekeeper, and mail clerk. (Id. at 35-36.) Accordingly, the ALJ concluded that Kimak is not disabled. (Id. at 36-37.)

## Analysis

Kimak argues that the ALJ committed reversible errors at steps two and three of the required analysis and in posing hypothetical questions to the VE. He also challenges the ALJ's RFC determination, arguing that it is the result of an

erroneous credibility analysis and an improper weighing of medical opinions. The government filed a cross-motion for summary judgment, arguing that the ALJ reasonably evaluated Kimak's impairments, properly explained her decision to prioritize the consulting physicians' opinions, and adequately supported her credibility analysis.

This court applies a deferential standard of review to the ALJ's decision, evaluating only whether that decision is free of legal error and supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). In determining whether substantial evidence supports the ALJ's decision this court considers the record as a whole but neither substitutes its judgment for the ALJ's nor reweighs the evidence. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004). Despite this deferential standard, this court will not hesitate to reverse where the ALJ does not adequately discuss the issues or build a "logical bridge" between the evidence and her conclusions. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

## A. The ALJ's Step-Two and Step-Three Analyses

Kimak first challenges the ALJ's failure to include spondylolisthesis, anterolisthesis, and failed spinal fusion among the severe impairments she identified at step two of the required five-step analysis. There is no need to linger

over this argument for long because the Seventh Circuit has made clear that an ALJ's failure to account for a severe impairment at step two of the analysis is harmless as long as the ALJ continues to the next step. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). That is because the step-two severity determination "is merely a threshold finding," meaning that as long as the ALJ finds one severe impairment then in the next steps the ALJ must consider the aggregate limiting effects of all of the claimant's limitations, whether severe or non-severe. *See Marino v. Colvin*, No. 12 CV 5721, 2013 WL 6858839, at *10 (N.D. Ill. Dec. 30, 2013). Here, the ALJ expressly acknowledged Kimak's complaints of grade two spondylolisthesis and failed post laminectomy fusion in developing the RFC.[2] (A.R. 32-33.) Accordingly, because the ALJ proceeded beyond step two and considered Kimak's severe and non-severe impairments in crafting the RFC, any error in omitting diagnosed conditions at step two was harmless. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (noting that ALJ's step-two characterization of condition as non-severe was "of no consequence with respect to the outcome of the case" where the ALJ recognized other severe impairments and proceeded to the next steps of the evaluation process).

Kimak also faults the ALJ for failing to consider at step three whether his condition is conclusively disabling because it meets or medically equals listing 1.03,

---

[2]  Because anterolisthesis is a subset of spondylolisthesis, *see Spondylolisthesis*, MedicineNet.com, http://www.medicinenet.com/spondylolisthesis/article/htm (last visited Apr. 30, 2014), the ALJ's failure to mention the former diagnosis makes no substantive difference where she expressly acknowledged the spondylolisthesis claim, (see A.R. 32).

which covers reconstructive surgery of a major weight-bearing joint. To meet or equal a listed impairment the claimant must demonstrate that he satisfies all of the listing's criteria. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Kimak has not satisfied that burden here. Listing 1.03 describes "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03. As the government points out, there is no evidence that Kimak's 1996 spinal fusion surgery involved a "major weight-bearing joint." The listings define "major joints" as referring to "the major peripheral joints, which are the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to . . . axial joints (*i.e.*, joints of the spine)." *Id.* § 1.00F. Kimak simply has not shown that his 1996 spinal surgery impacted joints included in the listings definition.

Nor has Kimak shown that he is unable to ambulate effectively as contemplated by listing 1.03. In describing what "inability to ambulate effectively" means, the listings require "an extreme limitation" of the ability to walk requiring the use of hand-held assistive devices that limit the functioning of both arms, such as a walker, two crutches, or two canes. *Id.* §§ 1.00B2b(1), B2b(2); *see also Kastner*, 697 F.3d at 650. Although there is evidence that Kimak uses a cane to help him walk, because he uses only one, that evidence falls short of the listings criteria.

Accordingly, this court finds no error in the ALJ's decision not to consider Kimak's impairment under listing 1.03.

## B.     Treating Physicians' Opinions

Kimak's motion gains traction when he turns to the ALJ's RFC analysis and challenges her decision to afford little or no weight to his two treating pain specialists, Drs. Anwar and Cheema, while giving significant weight to the opinion of Dr. Bilinsky, who never examined Kimak.  An ALJ is entitled to discount a treating source's opinion if it is either unsupported by medically acceptable diagnostic techniques or is inconsistent with other substantial evidence.  20 C.F.R. § 404.1527(c)(2); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). The rules governing an ALJ's evaluation of a treating source's opinion require the ALJ to consider the length of the treating relationship, the frequency of examination, the doctor's specialization, and whether the opinion is supported by and consistent with the record as a whole.  *See* 20 C.F.R. § 404.1527(c); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).  Those rules are designed to strike a balance between the benefit that derives from a treating physician's ability to observe a claimant over an extended period and the danger that the same doctor will be too quick to find disability out of loyalty to, or sympathy for, the patient.  *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011).

Here, the ALJ skipped over the required factors governing the weighing of medical opinions and gave reasons for discounting Dr. Anwar's opinion that fail to provide a "logical bridge" between the record and her conclusion.  *See Jones*, 623

F.3d at 1160. Absent from the ALJ's decision to discard Dr. Anwar's opinions is any discussion of the length and frequency of his treating relationship with Kimak, his specialization, and his knowledge of Kimak's impairments. *See* 20 C.F.R. § 404.1527(c). That absence is particularly concerning because Dr. Anwar is a specialist in pain management who treated Kimak on an almost monthly basis over a period of more than four years for the very condition he claims is disabling him. Had she weighed those factors explicitly, the ALJ might have concluded that Dr. Anwar's medical opinions are entitled to more than the "little or no weight" she assigned them. (A.R. 34.)

Turning to the three reasons the ALJ articulated for discounting Dr. Anwar's opinion, she first faults Dr. Anwar for not including "a function by function analysis as required under the regulations." (Id.) But as the government concedes in its own motion, (R. 30, Resp. at 6), the regulations do not require a treating physician to base his opinion on a function-by-function assessment, *Pursell v. Colvin*, No. 12 CV 5455, 2013 WL 3354464, at *12 (N.D. Ill. July 3, 2013). Even if they did, the ALJ's assertion is confusing because she herself acknowledged that Dr. Anwar described a long list of Kimak's functional limitations. (A.R. 34.) For example, in July 2009 Dr. Anwar described Kimak as being unable to lift more than 10 pounds or to bend, reach, or use his hands. (Id. at 452.) He further described Kimak as having the functional capacity to sit for only 30 to 45 minutes and to stand for only 30 minutes at a time. (Id.) He said that Kimak has impaired concentration, reduced speed and accuracy in tasks, and the inability to motivate and persevere. (Id.) Dr. Anwar

echoed his assessment of those functional limitations in a second opinion from December 2009. (Id. at 669.) Accordingly, the ALJ's first reason for discounting Dr. Anwar's opinion does not hold up under the substantial evidence standard.

The second reason the ALJ gave for disregarding Dr. Anwar's opinion is equally wobbly and casts doubt on the level of attention she gave to his treatment notes. The ALJ ruled that his opinions are owed little or no weight because they "are based on the claimant's subjective complaints," which she considered less than credible. Although an ALJ is entitled to discount a treating physician's opinion when it simply parrots the claimant's subjective complaints, *see Ketelboeter*, 550 F.3d at 625, here Dr. Anwar's notes reflect that he physically examined Kimak during their appointments leading up to his 2009 opinion. (See, e.g., A.R. 408, 412, 414, 439, 441.) During those examinations he observed tightness and tenderness in Kimak's back muscles. (Id. at 409, 412, 414.) In the course of their treating relationship Dr. Anwar prescribed Kimak narcotics (including morphine and Vicodin) and performed numerous epidural procedures in an effort to relieve his pain. He explained his decisions to embark on those interventions not just by pointing to Kimak's self-reports, but on the basis of Kimak's diagnosed conditions, including post-laminectomy syndrome, lumbar radiculopathy, lumbar sciatica, and lumbar disc degeneration. (Id. at 390, 397, 406.) Thus the record simply does not support the ALJ's assertion that Dr. Anwar's opinion is based only on Kimak's subjective complaints, rather than on his own observations made over the course of a long history of physical examinations.

The only remaining reason the ALJ gave for discounting Dr. Anwar's opinion—which includes the statement that Kimak is unable to reach or use his hands, (A.R. 452)—is her assertion that it is inconsistent with consulting examiner Dr. Jain's opinion that Kimak has no limitations in his upper extremities, (id. at 34). Given the lack of support for the other two reasons, this final reason is too flimsy a platform on which to rest a decision to discount the opinion of Kimak's long-standing treatment provider. As Kimak points out, his claim is based on his assertion that he is disabled by overwhelming back pain, not by any difficulties using his hands. Thus to the extent that there is an inconsistency between the two physicians' findings, it is a tangential one that has little bearing on the heart of Kimak's claim. Especially given the ALJ's failure to grapple with the factors set out in 20 C.F.R. § 404.1527(c), the cited discrepancy is not enough to assure the court that the ALJ properly weighed Dr. Anwar's opinion.

Although this court agrees with Kimak that the ALJ improperly explained her decision to disregard Dr. Anwar's opinions, his argument is less persuasive with respect to Dr. Cheema. The ALJ gave his opinion "minimal weight" in part because she found it to be based only on Kimak's complaints. (Id. at 34-35.) Here that assertion finds support in the record, because while Kimak reports that he saw Dr. Cheema for at least four months, the only record evidence of their treatment relationship is the opinion letter Dr. Cheema submitted in January 2011, characterizing Kimak as being completely disabled. (Id. at 680.) In contrast to the record history of Kimak's relationship with Dr. Anwar, there are no treatment notes

in the record to support Dr. Cheema's opinion. Nor is there any evidence that his opinion is based on objective evidence or physical examinations, as opposed to Kimak's subjective reports. Thus the record supports the ALJ's characterization of Dr. Cheema's opinion, which she was entitled to disregard given the lack of evidence that it stems from anything other than Kimak's self-reports. *See Ketelboeter*, 550 F.3d at 625.

It must also be noted that the ALJ did not cite any physician opinion endorsing Kimak as having an RFC for light work. She gave significant weight to consulting physician Dr. Bilinksy's opinion, but he opined that Kimak can stand and/or walk for only "at least 2 hours in an 8-hour workday." (A.R. 469.) That limitation would preclude light work, which requires the claimant to be capable of standing and/or walking for six hours out of the eight-hour work day. *See* SSR 83-10, 1983 WL 31251, at *5-*6; *see also* 20 C.F.R. § 404.1567(b). Dr. Nesbitt, who examined Kimak, relied on Dr. Bilinsky's opinion to support her finding that he can engage in only sedentary work. (A.R. 216.) Given that there does not appear to be any medical opinion supporting a finding that Kimak can engage in light work, on remand the ALJ must more fully explain her departure from the medical authority if she again finds him capable of performing light work. *See Nash v. Colvin*, No. 12 CV 6225, 2013 WL 5753796, at *13 (N.D. Ill. Oct. 23, 2013).

## C.   Credibility Analysis

Kimak next challenges the ALJ's credibility analysis, arguing that the ALJ failed to weigh required factors in discounting his testimony and gave unsupported

reasons for finding him lacking in credibility. Kimak's challenge to the ALJ's credibility analysis presents a fairly close call. On the one hand, this court's review of the ALJ's credibility determination is particularly deferential, allowing reversal only where the analysis is "patently wrong." *See Schomas*, 732 F.3d at 708. On the other hand, a credibility determination will not stand where the only reasons supporting it are based on a misreading or mischaracterization of the record. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). Here, Kimak has shown that enough of the ALJ's reasons for discrediting his testimony are unsupported as to warrant a reassessment of his credibility on remand.

Kimak first challenges the ALJ's blanket statement that his symptoms "are not supported by objective clinical and diagnostic findings." (A.R. 32.) As an initial matter, it must be noted that the Seventh Circuit has made clear that an ALJ may not discount a claimant's pain allegations solely on the basis that they lack objective support. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012). That is because "[p]ain can be severe to the point of being disabling even though no physical cause can be identified." *Pierce*, 739 F.3d at 1050. But here, the ALJ's statement is particularly perplexing because there is ample diagnostic and objective record evidence supporting Kimak's allegations of back pain. As the ALJ acknowledges later in her decision, after Kimak reinjured his back in 2005, x-rays showed that he had anterior and posterior

fusion at L5-S1 and degenerative disc disease at L4-5. (A.R. 33.) There is evidence that Kimak had residual scar tissue from his 1996 surgery that could cause soreness and made it difficult for injected pain medication to infiltrate. (Id. at 336-37, 343, 348.) Dr. Anwar reported after more than one examination that Kimak showed signs of tightness and tenderness in his paraspinal and psoas muscles. (Id. at 409, 412, 414.) Dr. Anwar also noted Kimak's reduced lumbar flexion (id. at 412), an observation that was confirmed by Dr. Jain who reported that Kimak had a decreased range of motion in the lumbosacral spine and positive right straight leg raising tests, (id. at 467). The ALJ never developed an analysis to explain why these records are inconsistent with the level of pain Kimak described. (Id. at 32-35.) In short, it is unclear why the ALJ considered Kimak's complaints to be out of proportion to the ample medical record documenting his on-going back pain issues.

The ALJ also found Kimak's use of a cane to be a black mark against his credibility because Kimak testified that he was given the cane after his 1996 surgery, and as the ALJ put it, she found "no objective evidence to support a finding that the surgeon who prescribed it intended for the cane to be used permanently." (Id. at 34.) But canes do not require a prescription, and so whether a doctor prescribes a cane is not probative of whether the claimant needs to use one in the first place. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (characterizing as "absurd" an ALJ's suspicion stemming from claimant's use of cane without prescription); *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009) (noting that claimant's use of walker without prescription is not enough to make pain

allegations unbelievable). Thus whether Kimak's doctor intended his use of the cane to be indefinite back in 1996 has no bearing on whether he actually needs to use one currently, and given the ample record evidence that he has been using his cane on an on-going basis to ease his pain, (see A.R. 50-51, 251, 467), the ALJ's reasoning on this point does not withstand scrutiny.

The ALJ also pointed to what she perceived as Kimak's reports to Dr. Anwar that his pain had improved in November 2008 and the months that followed. Although it is true that during this period Dr. Anwar's notes reflect that Kimak reported "less intense low back pain," (id. at 448), it is unclear how a relative improvement is inconsistent with his claim that his pain is ongoing. That is especially true because Dr. Anwar's notes from the period of relative improvement show that he considered the improvement to be the maximum that is medically possible for Kimak. (Id. at 439-42.) Even in that state of maximum improvement, Dr. Anwar considered his condition sufficiently severe that he continued to view him as a candidate for morphine sulfates and lumbar caudal epidural steroid injections under fluoroscopy. (Id.) In the same records, Dr. Anwar described Kimak's back pain as "chronic." (Id.) Thus it is unclear how a period of relative improvement in late 2008 and early 2009, during which Kimak still required intensive medical intervention to control his pain, detracts from Kimak's credibility regarding the intensity of the pain he was experiencing at the time of the 2011 hearing.

Although neither party raised the issue, it also should be noted that there is actually a fair amount of ambiguity in Dr. Anwar's notes from the period that the ALJ characterized as one of relative improvement. In particular, although it is true that Dr. Anwar's notes from November 2008 through June 2009 consistently describe Kimak as reporting "less intense low-back pain," those same notes include a section labeled "Plan" that seems to contradict those reports. (Id. at 439, 441, 444, 448.)[3] There, Dr. Anwar consistently wrote that Kimak was "suffering from increase low [back] pain." (Id.) He described Kimak as experiencing "less significant relief with the Duragesic patches" and suggested more lumbar caudal epidural steroid injections. (Id.) In addition to that internal inconsistency, the notes from this period show hardly any variation, casting doubt on their accuracy. For example, all of the notes from this period reflect that Kimak "got fired from work last one month." (Id.) The ALJ might have pointed to these issues as support for her decision to discount Dr. Anwar's opinion. Instead, she cherry-picked the lines from these notes describing Kimak's reports of "less intense low–back pain" as a reason to doubt the credibility of Kimak's pain complaints. (Id. at 33.) Her failure to acknowledge the aspects of those same notes that detract from her credibility analysis thus further erodes the support for her decision to discount Kimak's credibility based on what she perceived as a period of relative improvement.

_____

[3] The notes at A.R. 444 reflect the date February 25, 2008, but given their placement in the record chronology and the fact that they echo the notes from the period between November 2008 and June 2009, it seems likely that those notes are meant to reflect a February 2009 visit.

That leaves what might be the best reason that the ALJ gave in support of her credibility determination: her observation that there are no records showing that Kimak received any treatment for his pain between his visit with Dr. Anwar in June 2009 and when he began to see Dr. Cheema in September 2010. (Id.) Kimak asserts that the gap is simply the result of the fact that the Commissioner last requested his medical records in June 2009, (R. 19, Pl.'s Br. at 16), but as the government points out, it is the claimant's responsibility to supply the evidence necessary to support his claim, *see Punzio*, 630 F.3d at 712. It is also true, however, that before holding a perceived treatment gap against a claimant in analyzing his credibility, the ALJ is required to explore the reasons for that gap. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Here, the ALJ never asked Kimak during the hearing if he continued to see a pain specialist between June 2009 and 2010, nor did she ask why he had not provided treatment records for that period. In using the absence of records against Kimak at the credibility phase, the ALJ unreasonably assumed that Kimak never received treatment during those 15 months without making any effort to get to the bottom of whether that assumption is true. *See* SSR 96-7p, 1996 WL 374186, at *7 (1996) (stating that ALJ may need to question claimant at hearing as to why he did not pursue treatment consistently); *Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994) (noting that it is unreasonable to infer "that the failure to submit medical reports establishes that [the claimant] did not receive any medical treatment during this period"). In fact, Kimak asserts that he did continue to see Dr. Anwar during that period and Dr. Anwar's November 2009

work-status form states that Kimak saw him for "monthly follow up medication review." (A.R. 707.) This is a matter that the ALJ should flesh out with Kimak, and because the other reasons underlying the credibility assessment lack support, the ALJ will need to reconsider that assessment and explore the reasons underlying the record gap on remand.

## D.     Hypothetical Questions Posed to the VE

Finally, Kimak argues that the ALJ's decision should be reversed because, he says, the hypothetical questions the ALJ posed to the VE failed to account for all of his limitations. Specifically, he argues that in crafting the hypotheticals the ALJ failed to account for what she identified as his moderate limitation in maintaining concentration, persistence, or pace. (A.R. 31.) Although the ALJ asked the VE to consider the work capacity of an individual limited to performing "simple, repetitive and routine work tasks," (id. at 77), Kimak argues that this limitation is insufficient to account for his concentration impairment.

The Seventh Circuit has made clear that "[w]hen an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). That rule exists "to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). In most cases, where the ALJ finds that a claimant is limited in his ability to maintain concentration, persistence, or pace, a hypothetical limitation to "simple, routine

tasks" does not adequately account for the medical limitation. *Stewart*, 561 F.3d at 684-85 (citing *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004)). The Seventh Circuit has recognized exceptions to this rule where the VE independently reviewed the medical record and so was aware of all of the claimant's medical restrictions or where "claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). An exception also exists where it is clear that an ALJ's "alternate phrasing" would exclude the activities that a person with the claimant's limitations could not perform. *Id.*

But none of these exceptions is present here, where Kimak's concentration issues are pain- and depression-related and where the VE testified only that he had the opportunity to review the record as to Kimak's vocational background. (A.R. 73.) It is unclear from this record whether the VE had the chance to review Kimak's medical record. There also is nothing in the ALJ's phrasing here, referencing "routine, simple" work and a "low stress work environment," (id. at 77, 80), that necessarily would exclude activities that a person with concentration limitations could not perform. The only time the ALJ mentioned concentration specifically to the VE was to ask whether a person would be able to sustain employment if he is likely to be off task for 25 percent of the work day "due to a combination of pain symptoms and other issues affecting concentration." (Id. at 82.) The VE answered that this kind of concentration-related limitation would eliminate all the jobs he had identified as being available to the hypothetical claimant the

ALJ's questions conjured. (Id.) Because from this record it is unclear whether the VE's testimony accounts for Kimak's moderate limitations in concentration, persistence, or pace, a remand is necessary. *See Adams v. Astrue*, 880 F.Supp.2d 895, 912-13 (N.D. Ill. 2012) (remanding where unclear that VE properly identified jobs claimant could perform where the VE relied on ALJ's flawed hypothetical). The ALJ should explicitly explore this limitation with the VE on remand.

## Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is denied, Kimak's motion for summary judgment is granted, and the case is remanded for further proceedings.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**